IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Lindau Chemicals, Inc., | ) |
|                 Plaintiff, | ) Civil Action No.: 3:18-cv-00706-JMC |
| v. | ) **AMENDED ORDER AND OPINION** |
| Matheson Tri-Gas, Inc., | ) |
|                 Defendant. | ) |

This matter is before the court pursuant to Plaintiff Lindau Chemicals, Inc.'s Motion for Summary Judgment against Defendant Matheson Tri-Gas, Inc. (ECF No. 30.) The court **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 30).

## I. JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship[1] between the parties and the amount in controversy herein exceeds the sum of Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs. (*See* ECF No. 1 at 3–4, ¶¶ 10–12.)

## II. FACTUAL AND PROCEDURAL BACKGROUND

Air Liquide U.S., L.P., ("Air Liquide") (later acquired by Defendant) entered into the Bulk Product Agreement (the "Agreement") with Plaintiff for the supply of liquid nitrogen from Air Liquide to Plaintiff. (ECF Nos. 30 at 1; 30-1; 31 at 1.) The parties executed the Agreement in January of 2011 with a retroactive effective date of October 25, 2010. (ECF Nos. 30 at 2; 30-1;

---

[1] For jurisdictional purposes, Plaintiff alleges that it is "a corporation organized and existing under the laws of the State of South Carolina, doing business in Richland County, South Carolina"; and Defendant is a "corporation organized and existing under the laws of a state other than South Carolina and is licensed to do business in South Carolina." (ECF No. 8 at 1 ¶¶ 1, 2.) In the Notice of Removal, Defendant established that it is "a corporation organized under the law of the State of Delaware with its principal place of business in New Jersey and Texas." (ECF No. 1 at 2 ¶ 6.)

1

31 at 2.) The Agreement is a requirements contract for Defendant to supply Plaintiff with bulk liquid nitrogen which is housed in Defendant's tank on Plaintiff's facility. (ECF Nos. 8 at 1-2; 19 at 1-2.) The Agreement required that it would last for an initial term of 84 months which was set to expire as of October 25, 2017. (ECF Nos. 8 at 1; 30-1; 31 at 2.) The contract would automatically renew for an additional 84-month term, unless cancelled by either party by providing 12 months' notice before the expiration of the initial or renewal term. (ECF Nos. 8 at 1-2; 30-1; 31 at 2.)

Paragraph 5(d) of the Agreement states:

if Customer requests relocation or modification of the Systems, Supplier may, at its option, carry out the relocation or modification. In that case, the term of this Agreement will be extended to a new Initial Term of the same length as the original Initial Term. The new term shall begin on the first day of the month following the completion of the relocation or modification. (ECF No. 30-1.)

Paragraph 5(b)(v) of the Agreement states that "Customer shall at its expense . . . reimburse Supplier for costs associated with the installation of any System installed by the Supplier." (*Id.*)

In August 2015, Plaintiff requested that Air Liquide install a new regulator manifold system. (ECF Nos. 30 at 3; 31 at 2.)[2] Plaintiff's Maintenance Manager John Hinkle, who has a bachelor of science degree in chemical engineering and over 18 years of experience in the chemical manufacturing industry, determined Plaintiff needed a new manifold and coordinated this installation. (ECF Nos. 30-2 at 1; 30-13 at 21.)

Air Liquide completed the work on August 21, 2015. (ECF Nos. 30 at 3; 31 at 2.) Plaintiff did not pay Defendant for this work. (ECF No. 30 at 4.) Plaintiff alleges the manifold would have cost roughly $2,000.00 to $5,000.00 to acquire on the open market in 2015 and that the installation took several hours to complete. (ECF No. 30 at 3–4.) Defendant alleges the

---
[2] Paragraph 5(e) of the Agreement states "[c]ustomer shall not tamper with, modify, or repair the Systems."

manifold would have cost roughly $8,000.00. (ECF No. 31-3.)

Robert Watkins, who joined Defendant as Regional Sales Manager in January 2017, previously worked as Air Liquide's Sales Manager for 28 years and had sales management responsibility for the Agreement. (ECF No. 31-3 at 1.) Watkins signed a letter dated August 28, 2015, which is addressed to Hinkle; the letter stated that the installation was completed on August 21, 2015 and "in accordance with Section 5 (d) of the Bulk Product Agreement between our firms, the Term of the Agreement is extended for a new Initial Term. The new Initial Term will commence on September 1, 2015 and shall remain in effect for a period of 84 consecutive months." (ECF No. 30-12.) Plaintiff alleges it has no record of receiving this letter prior to October 12, 2017, when it was attached to an email from Defendant in which Defendant alleged that the new initial term had been triggered in August 2015. (ECF Nos. 30-11; 30-13 at 54–55; 30-14 at 35.)

In September of 2016, Defendant acquired the rights to the Agreement with Plaintiff from Air Liquide and began providing liquid nitrogen to Plaintiff at its facilities. (ECF Nos. 30 at 4; 30-3; 31 at 3.) On October 20, 2016, Plaintiff sent a letter notifying Defendant of its intention to terminate the Agreement. (ECF Nos. 30 at 4; 30-4; 31 at 3.) Defendant alleges that it was not aware of the purported new initial term at that time. (ECF No. 31 at 3.) In the Spring of 2017 Defendant engaged in negotiations with Plaintiff in an effort to continue the relationship, but the negotiations failed. (ECF Nos. 30 at 4–5; 31 at 3.) On June 29, 2017, Defendant sent Plaintiff a letter stating that, effective July 11, 2017, Defendant would increase its monthly prices. (ECF Nos. 30 at 5; 30-10; 31 at 11.) Plaintiff purports the increase was 15% for liquid nitrogen and 10% for the addition of various other fees. (ECF No. 30 at 5.) In its Second Motion for Summary Judgment, Plaintiff argues that because the price increase was above 5%, Defendant's actions

potentially triggered the "Revision of Prices" clause in ¶ 6. (*Id.* at 6.) This clause states that if Defendant increases prices by an amount greater than 5%, Plaintiff can present Defendant with a price quote from another supplier. (ECF No. 30-1.) Defendant can then either 1) return to the original, prior fee schedule, or 2) meet or beat the quote price from the alternative supplier. (*Id.*)

On October 27, 2017, Defendant sent Plaintiff a memo stating that it had recently discovered the August 28, 2015 letter and informing Plaintiff that the Agreement had been renewed following the August 2015 work. (ECF Nos. 30 at 6; 30-11; 31 at 3.) In that letter, Defendant informed Plaintiff that the new initial term remained in effect until 2022 and attached the August 28, 2015 letter. (ECF Nos. 30-11; 31 at 3.) Plaintiff then filed the Complaint on February 23, 2018, seeking a declaratory judgment that the Agreement between Plaintiff and Defendant was properly terminated by Plaintiff and is of no present substantive effect. (ECF No. 1-1.) Plaintiff demanded a jury trial. (*Id.*) Defendant removed the matter to this court on March 15, 2018. (*Id.*) Plaintiff filed an Amended Complaint on March 27, 2018.[3] (ECF No. 8.) Defendant answered by denying Plaintiff's allegation and counterclaiming for damages stemming from Plaintiff's alleged breach of contract pertaining to the exclusivity provision. (ECF No. 19.) After the parties engaged in discovery, Plaintiff filed a second summary judgment motion.[4] (ECF No. 30.) Defendant responded in opposition. (ECF No. 31.) On October 25, 2018, the court heard arguments regarding Plaintiff's Second Motion for Summary Judgment.[5] (ECF No. 34.)

---

[3] The Complaint was amended to add a cause of action for conversion for the alleged wrongfully charged sales tax by Defendant. (ECF No. 8 at 3 ¶ 14.) On September 7, 2018, Plaintiff filed a Stipulation of Dismissal with Prejudice only as to its conversion cause of action alleged in the Amended Complaint. (ECF No. 29.)
[4] On May 29, 2018, the court denied Plaintiff's First Motion for Summary Judgment as premature. (ECF No. 21.)
[5] Upon learning that Plaintiff was receiving its liquid nitrogen from another company, Defendant and Plaintiff made arrangements for Defendant to remove its supply tank from Plaintiff's premises on September 5, 2018. (ECF Nos. 30 at 7–8; 31 at 4.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Further, to show that a genuine issue of material fact exists, the non-moving party must set forth facts beyond "[t]he mere existence of a scintilla of evidence." *Id.* at 252. The non-moving party must present evidence sufficient to demonstrate that a reasonable jury could return a verdict for the non-moving party in order to avoid summary judgment. *See id.* at 248.

## IV. DISCUSSION

Plaintiff contends that there is not a genuine dispute that the August 25, 2015 manifold installation was a service call under the Agreement, and therefore, Plaintiff properly terminated the contract as of the end of the initial term in October of 2017. (ECF No. 30.) Plaintiff further argues that even if there is a slight ambiguity as to whether the work completed was a service call under the Agreement, it must be construed against its drafter, Defendant. Watkins avowed in his Declaration that it was standard practice of Air Liquide to send a letter such as the August 28,

2015 letter memorializing a new term but did not state that the letter was ever sent to Plaintiff prior to October 12, 2017. (ECF No. 31-3.) Regarding the negotiations that occurred in the Spring of 2017, Watkins declared that, although he previously worked for Air Liquide before moving to Defendant in January of 2017, he did not recall during the price negotiations that the Agreement had purportedly been renewed until 2022. (ECF No. 31-5.)

Defendant argues that there is a genuine dispute as to whether the August 25, 2015 manifold installation is a modification or a service call under the Agreement because the Agreement is ambiguous. (ECF No. 31 at 5–7.) Thus, if this ambiguity cannot be resolved by summary judgment, the court cannot declare as a matter of law that the work triggered a new term of 84 months under section 5(d) of the Agreement. (*Id.* at 5.)

**The Ambiguity of the Agreement's Classification of Modifications and Service Calls**

Defendant argues that the term "modification" is not defined in the contract and is ambiguous, and that ambiguity creates a genuine issue as to a material fact. (*Id.* at 5.) A contract is ambiguous when it is reasonably susceptible to more than one interpretation.[6] *S.C. Dep't of Nat. Res. v. Town of McClellanville*, 550 S.E.2d 299, 302 (S.C. 2001); *Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 878 (S.C. Ct. App. 1997). "It is a question of law for the court whether the language of a contract is ambiguous." *S.C. Dep't of Natural Res. v. Town of McClellanville*, 550 S.E.2d 299, 302–03 (S.C. 2001). A contract is read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause. *Id*. A court must construe any doubts and ambiguities in a contract against the drafting party. *Chassereau v. Global Sun Pools, Inc.*, 644 S.E.2d 718, 722 (S.C. 2007).

---

[6] Generally, the court applies South Carolina law when a contract dispute is brought pursuant to the court's diversity jurisdiction. *See Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 993 F. Supp. 2d 581, 586 (D.S.C. 2014) ("Because this action falls under the diversity jurisdiction granted to the federal courts by 28 U.S.C. § 1332, the [c]ourt looks to the law of South Carolina to determine the standards by which to evaluate the contract." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938))).

Where a contract is unambiguous, the matter becomes one of law and the parties' intent as clearly set forth in their agreement must be given effect. *See McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009). Conversely, when a contract is ambiguous, the fact finder must ascertain the parties' intention from the evidence presented. *Charles v. B & B Theatres, Inc.*, 106 S.E.2d 455, 456 (S.C. 1959).

The court must address the meaning of the following provisions contained in the Agreement to determine if the ambiguity exists as to the classification of the manifold installation as a service call or a modification:

> Deliveries & Miscellaneous Services . . . Additional services as described in Exhibit 1 are available at Supplier's then current standard rate. Any and all services provided by Supplier to Customer shall be governed by the terms of this Agreement unless the parties otherwise agree in writing. The Agreement ¶ 4(g).
> . . .
> Customer shall at its expense . . . reimburse Supplier for costs associated with the installation of any Systems installed by Supplier. *Id.* at ¶ 5(b)(ii).
> . . .
> Customer shall at its expense . . . reimburse Supplier for labor, parts and materials as the result of any customer initiated service call made by Supplier or Supplier's representative, except for the standard preventive maintenance service as defined by Supplier's maintenance guidelines. *Id.* at 5(b)(v).
> . . .
> Obligations Relating to Systems . . . if Customer requests relocation or modification of the Systems, Supplier may, at its option, carry out the relocation or modification. In that case, the term of this Agreement will be extended to a new Initial Term of the same length as the original Initial Term. *Id.* at ¶ 5(d).

A review of the provisions shows the language of the Agreement is ambiguous as to the classification of various items. For example, in ¶ 4(g), the Agreement specifically refers to the items listed in Exhibit 1 as services. (ECF No. 30-1.) Additionally, during the Motion for Summary Judgment hearing, Defendant stated that any item listed in Exhibit 1 is a service. However, ¶ 5(b)(ii) creates a new category for the installation of any Systems, yet the Agreement does not specify if an installation is considered a service under Exhibit 1 or a modification. (*Id.*)

7

Exhibit 1 includes a line item for "Equipment Installation/Removal" with the notation that "pricing varies based on specific customer requirements." (ECF No. 30-1.) Equipment is not defined in the contract and could encompass any number of items. (*Id.*) For example, the manifold at issue, along with numerous other components of the Systems, could be interpreted to be a piece of equipment which would therefore be classified as a service under Exhibit 1. However, installing a sufficient amount of new equipment in the System could arguably rise to the level of a modification of the System.

The court finds the Agreement ambiguous as to whether the installation of equipment would be classified as a service under Exhibit 1 or as a modification. The notations regarding price for an "Equipment Installation/Removal" further suggests that the level of work was variable as Defendant anticipated the price fluctuating depending on the quality and quantity of work needed.

Further, the court observes that none of Plaintiff's employees who were involved in the work at issue testified that it was a service call. All individuals questioned regarding the nature of the work stated either that it was not part of the service call or that it was a modification. (ECF Nos. 30-13; 30-14; 31-3.) In their depositions, Hinkle and Steven Doudoukjian, Plaintiff's Plant Manager who authorized Hinkle's request to Air Liquide for the new manifold, both stated that the new manifold was "necessary" to Plaintiff's manufacturing processes. (ECF No. 30-13 at 29, 30; ECF No. 30-14 at 15–18; 29–30.) Hinkle testified "an element of [the work completed] was not part of the routine service, the installation of the manifold." (*Id.* at 33–34.) He also testified that Defendant's technician Steve Kimbrough, who installed the manifold, told him that Defendant would not charge Plaintiff for the installation. (*Id.* at 45–46.) Watkins asserted in his Declaration that "[p]ursuant to industry custom and practice, the installation of the higher

pressure manifold is a system modification." (ECF No. 31-3 at 1.)

Courts should focus on the plain meaning of the words in a contract. *Benner v. Nationwide Mut. Ins. Co.,* 93 F.3d 1228, 1237 (4th Cir. 1996); *C.A.N. Enters. v. S.C. Health & Human Servs. Fin. Comm'n,* 373 S.E.2d 584, 586 (S.C. 1988) (an unambiguous, clear, and explicit contract "must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense."). As noted above, Systems is defined as the storage system, complete with safety and control apparatus, which suggests that the manifold installed was a part of the Systems as it was a safety apparatus. However, the Agreement fails to define the terms "modification", "service", or "equipment". Therefore, the court must consider the plain and ordinary meaning of these terms.[7] It remains ambiguous whether the installation of a regulator manifold would fall under the terms "equipment", "modification", or "service", even when considering the terms' plain meanings.

While the standard for summary judgment demands the court view any relevant facts in the light most favorable to the non-moving party, the tenets of contract law demand the court resolve any ambiguities against the drafting party, which is Defendant in this case. Therefore, the court finds that the Agreement is ambiguous because it is reasonably susceptible to more than one interpretation. The question of whether the parties intended for the installation of a regulator manifold to be a service or a modification is one for the fact finder, not for the court. As such a

---

[7] Ordinarily, "modification" means "the making of a limited change in something." Merriam-Webster.com, https://www.merriam-webster.com/dictionary/modification (last visited Oct. 29, 2018). A relevant definition of service is "the act of serving: such as . . . useful labor that does not produce a tangible commodity–usually used in plural." Merriam-Webster.com, https://www.merriam-webster.com/dictionary/service (last visited Oct. 29, 2018). Equipment is commonly defined as "the implements used in an operation or activity." Merriam-Webster.com, https://www.merriam-webster.com/dictionary/equipment (last visited Oct. 29, 2018). The industry generally defines a regulator manifold as a "method of connecting multiple cylinders to a common gas supply line to provide centralized distribution of gas. . ." *Gas Delivery Equipment*, Matheson, http://www.mathesongas.com/pdfs/products/Model-53-&-54-Manifold-Systems.pdf (last visited Oct. 29, 2018).

genuine dispute exists as to a material fact–the classification of the manifold installation–and summary judgment is not appropriate.[8]

## VI. CONCLUSION

For the reasons provided above, the court finds that the relevant Agreement language is ambiguous and therefore creates a genuine dispute as to a material fact. Therefore, the court **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 30).

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

December 11, 2018
Columbia, South Carolina

---

[8] Plaintiff's argument that the June 29, 2017 price increase letter triggered the Revision of Prices clause is irrelevant until a fact finder determines the meaning of the ambiguous contract.